691 P.2d 1073

**STATE of Arizona, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF PIMA, and the Honorable William L. Scholl, a Judge thereof, Respondent,**

**and**

**Gene SIMMONS, Mary Miller, Glen Ethington, Jerry Collier, Real Parties in Interest.**

No. 17679–SA.

Supreme Court of Arizona, In Banc.

Nov. 21, 1984.

Reconsideration Denied Jan. 8, 1985.

Frederick S. Dean, Tucson City Atty. by Frank W. Kern, III, Deputy City Atty., Tucson, for petitioner.

Michael L. Altman, Tempe, and Law Offices of Kelly C. Knop, P.C. by Kelly C. Knop, Tucson, for real parties in interest.

CAMERON, Justice.

This is a special action brought by the State from a decision of the Superior Court of Pima County affirming the granting of defendants' motion to dismiss the complaints against them. We have jurisdiction pursuant to Art. 6, § 5 of the Arizona Constitution.

We must decide the following issue: Were the sobriety checkpoints conducted by the Tucson Police Department between 9 December 1983 and 31 December 1983 constitutional?

The facts follow. The Tucson Police Department set up a series of sobriety checkpoints between 9 and 31 December 1983. The stops were constructed and operated according to an extensive command directive compiled by the Commander of the Traffic Enforcement Division. The checkpoints were not to be set up on main, high traffic volume arteries. The directive provided that a driver would first encounter a sign saying "Reduce Speed Ahead." Approximately two hundred feet from the sign would be another sign saying "Speed Limit Twenty Five Miles Per Hour." Another hundred feet away a sign stated "Sobriety Checkpoint Ahead." A coning pattern was placed eight hundred feet further away to divert traffic. If there were any side streets before the coning pattern, a No-Turn sign would be placed in front of the street. After the cones there would be a "Prepare to Stop" sign and two hundred feet from that would be a stop sign. A police officer would approach the car and ask the driver to pull up to a second officer. This first officer would shine a flashlight into the car to determine whether the driver or passenger had any weapons. The second officer would then ask the driver to produce his driver's license. He would also shine a light into the car to look for open containers and observe the driver closely for signs of intoxication and would be permitted to ask him such questions as "where have you been tonight" and "what do you think about checkpoints." If the officer had no basis for believing that the driver

was intoxicated, the driver would be permitted to proceed. The entire process took anywhere from five to twenty seconds. If the driver seemed to be impaired the officer would ask him to proceed into a predesignated parking area where he would be asked to perform a field sobriety test.

The police were also prepared for drivers attempting to avoid the roadblock. A chase officer would follow any driver making a turn prior to the initial reduce speed ahead sign for one mile. If any traffic violations or problems were noted that would warrant a stop under normal circumstances, a stop would be made to check for impairment. The same procedure would occur for a person who drove safely through the roadblock but refused to talk with the officers. If a driver made a turn at a No-Turn sign, a chase officer would stop the driver to check for signs of intoxication. No citations were issued for traffic violations such as driving with an expired license. Rather, the driver would be informed of the violation and advised to correct the deficiency.

Defendants Gene Simmons, Mary Miller, Glen Ethington and Jerry Collier were stopped pursuant to these checkpoints and arrested for Driving Under the Influence of Intoxicating Liquor, A.R.S. § 28–692. They each filed a motion to dismiss, alleging that the checkpoints were unconstitutional. The four motions were consolidated for hearing and granted by the Municipal Court judge (the trial court). The state appealed to the Pima County Superior Court, Ariz. Const. Art. 6, § 16 and A.R.S. § 12–124, and the trial court ruling was affirmed. We accepted jurisdiction because the case presents an issue of statewide importance.

The issue of the propriety of roadblocks has been before us before. In *State ex rel. Ekstrom v. Justice Court*, 136 Ariz. 1, 663 P.2d 992 (1983) we examined a series of roadblocks conducted by the Department of Public Safety. We held that because the police were given a "not insubstantial amount" of discretion and the state was unable to demonstrate that roadblocks were more effective in apprehending drunk drivers than traditional methods, those sobriety checkpoints were unconstitutional. Justice Feldman, in his concurrence, listed those procedures that he felt were constitutionally required. He focused primarily on the need for a plan formulated or approved at the executive level that would provide standards concerning time, place, number of officers and procedures concerning how the stops should be conducted. Advance publicity in the media was also suggested. Id. at 9, 663 P.2d at 1000.

It appears that the suggestions made by Justice Feldman in his concurrence in *Ekstrom, supra*, were followed by the Tucson Police Department. A command directive was compiled by the Commander of the Traffic Enforcement Division, Lieutenant Davis, concerning the procedures to be followed at the roadblocks. Copies were distributed to all personnel who would be participating at the checkpoints. The directive outlined what the officers were supposed to say to drivers of stopped cars and how the officers should react in various situations. The location of each stop was also selected by Lieutenant Davis. He reviewed statistics compiled by the police department concerning the location of alcohol related collisions and chose sites within approximately a square mile of where the highest percentage of such accidents had occurred.

Press releases were issued before the first three roadblocks were conducted. For the other roadblocks, information was given to the community relations unit, which then transmitted it to the public through radio, television and newspaper advertisements. These announcements, which were issued from one to three days in advance of each roadblock, stated that stops would be conducted in the City of Tucson.

 The question is whether these procedures did, in fact, satisfy the fourth amendment's proscription against unreasonable searches and seizures. U.S. Const. amend. IV. That amendment is implicated because roadblock stops are considered seizures. *United States v. Martinez-Fuerte,*

428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Although the Supreme Court has never squarely addressed this issue, it has indicated that in certain instances brief detentions made without any quantum of suspicion would be permissible. In *Martinez-Fuerte*, supra, the Court upheld the use of a fixed checkpoint stop near the border of Mexico to search for illegal aliens. Later the Supreme Court stated in a case involving a random stop made by the police to check for license and vehicle registrations that:

> This holding does not preclude the state of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.

*Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673–74 (1979) (footnote omitted). The United States Supreme Court subsequently laid down a "balancing of interests" test to evaluate certain distinct types of official action. Three factors must be weighed: "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 362 (1979).

■ In the instant case, the first factor, the gravity of the public concern, clearly weighs in favor of the state. The state, at the suppression hearing, indicated that it used the sobriety stops to deter people from driving while impaired. The trial court found that this constituted a "unique governmental interest." We agree. Drunk driving has become a problem of epidemic proportions not only in Arizona but throughout the country. *See State v. Deskins*, 234 Kan. 529, 536, 673 P.2d 1174, 1181 (1983) ("It is obvious, without resort to the record or otherwise, that the problem of the drunk driver is one of enormous magnitude affecting every citizen who ventures forth upon the streets and highways."); *State v. Coccomo*, 177 N.J.Super. 575, 582, 427 A.2d 131, 134 (1980) ("No one can deny the State's vital interest in promoting public safety upon our roads by detecting and prosecuting drunk drivers."). Drunk drivers are responsible for approximately seventy deaths a day. Allstate, *The Drunk Driver May Kill You.* The state should and must act to protect drivers from the havoc wreaked by the mixture of alcohol and gasoline. Roadblocks, properly maintained and publicized, not only apprehend the drinking driver, but inhibit others who might be tempted to drive while drinking.

The second prong of the test is the degree to which the seizure advances the public interest. The trial judge, at the suppression hearing, found that the state had not made it over this hurdle. The court focused on the statement made by the Commander of the Traffic Enforcement Division that "in doing a check point operation you will end up with about half of the amount of the arrests that the same officer deployed in the field would produce." The court held that by making this statement the state had in effect "stipulated itself out of court." In so holding, the trial judge relied on the statement we made in Ekstrom that "[i]f there is an adequate method of enforcing the drunk driving statute, there is no pressing need for the use of an intrusive roadblock device." *Ekstrom*, 136 Ariz. at 5, 663 P.2d at 996.

We find this reliance on Ekstrom misplaced. In Ekstrom, supra, the state argued that the roadblock was useful in arresting drunk drivers. The state was unable, however, to prove that checkpoints were more successful than traditional methods. In the instant case the sobriety stops were intended primarily for deterrence. The police anticipated that people would feel that the chances of detection were increased by the checkpoint and would be less inclined to drink and drive. The state offered evidence not only that it was successful toward this end but that there was no less intrusive alternative. It introduced statistics that the percentage of

injuries that were alcohol related from September to December of 1983 was between 9 and 11.5. From 1 December to 8 December this percentage was also 11.5. That number fell to 8 percent after the roadblock was instituted. This drop is particularly significant in light of the fact that a high percentage of alcohol related accidents traditionally occur in December. Furthermore, the police had been unable to effectuate this significant a drop in the percentage of alcohol related collisions by the more traditional method of increasing the number of patrol officers trained in detecting intoxicated drivers.

The difference between the Kingman roadblocks and the Tucson roadblocks was that in Kingman the efforts resulted in fewer drunk drivers being removed from the road than normal, routine patrols by the same number of patrolmen would have effected. In other words, the intrusion did not result in benefit to the public. In Tucson, the intrusion justified the effort as the drunk driving accident rate went down as a result of the roadblocks and the attendant publicity. We believe the public interest was advanced by these roadblocks.

Lastly, we must examine the severity of the interference with individual liberty. In assessing this factor, the Supreme Court has outlined certain considerations it finds important. First, there is the degree of the "objective intrusion": the stop itself, the questioning, and the visual inspection. *Martinez-Fuerte*, supra, at 558, 96 S.Ct. at 3083, 49 L.Ed.2d at 1128. In the instant case, the stops lasted from five to twenty seconds. The officers did not make a full blown search of the car but merely shined a flashlight into the passenger area to ensure that no one inside was carrying a weapon and to look for open containers of alcohol. Questioning was minimal. The officers were only permitted to ask one or two questions in order to determine whether the driver was intoxicated. Thus the objective intrusion was minimal.

The United States Supreme Court has also examined the subjective intrusion: the generating of concern or fright on the part of lawful travelers. *Id.* at 559, 96 S.Ct. at

3083, 49 L.Ed.2d at 1129. It found this to be at a minimum in cases where the police were given little discretion and motorists knew or were able to obtain knowledge of the reason for the roadblock and its location. *Id.* In the case at bar, the police had little discretion. Motorists were given advance warning that checkpoint stops would be conducted and why. Although drivers were not told of the exact location of the stops, we do not find this critical. Advance notice of the exact location is not an absolute necessity for DWI roadblocks. *See Jones v. State*, 36 Cr.L. 2004 (Fla.Ct.App. 10/3/84); *Commonwealth v. McGeoghegan*, 389 Mass. 137, 143, 449 N.E.2d 349, 353 (1983). Publishing the exact spot of the checkpoint would lessen the deterrent effect. Motorists, aware of where they would be stopped, would simply avoid those locations. Additionally, because there were signs at each stop indicating that it was a sobriety checkpoint, drivers were aware of the purpose for the stop and if they had not been drinking would have little cause for concern. *Cf. State v. Deskins*, supra, at 541, 673 P.2d at 1185 (numerous conditions and facts concerning intrusion to the motorist must be considered but not all need to be favorable to the state).

Given the gravity of the problem, a compelling need for the state to take strong action against drunk drivers, and the minimal intrusion created by these stops, we hold the stops in this case passed constitutional muster.

The order of the Pima County Superior Court is reversed and the cases are remanded for proceedings consistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and FELDMAN, J., concur.

NOTE: Justice Jack D. H. Hays did not participate in the determination of this matter.