[No. 14830-3-I.   Division One.   December 8, 1986.]

C. STEVEN FURY, ET AL, *Respondents*, v. THE CITY
OF SEATTLE, ET AL, *Appellants*.

Douglas N. Jewett, City Attorney, and Douglas B. Whalley and Terrence J. Cullen, Assistants, for appellants.

Dan W. Kilpatric, Kenneth H. Davidson, and Davidson, Czeisler & Kilpatric, for respondents.

WEBSTER, J.—Plaintiffs C. Steven Fury, William E. Fitzharris, Kevin McKinney, Ron Lindsay, William Wasserman, and Marsha Pechman brought suit for declaratory and injunctive relief against the City of Seattle. The plaintiffs prevailed on summary judgment. The issues before this court are the validity of the City's DWI[1] checkpoint program under the fourth amendment of the United States Constitution and under article 1, section 7 of the Washington State Constitution. We hold that the checkpoints are permissible under both state and federal law because the compelling public interest in curbing the carnage caused by drunk drivers, and the checkpoint program's effectiveness toward that end, outweigh the slight intrusion on the privacy of those motorists stopped at the checkpoints. Consequently, we reverse.

---

[1] Driving while under the influence of intoxicating liquor or drug. RCW 46.61-.502.

## FACTS

In 1983 the City of Seattle Police Department developed a plan to conduct a series of DWI roadblocks—the City called them checkpoints—designed to detect drunk drivers during the holiday season of 1983–84. Sites were selected based on the recorded geographical concentration of DWI arrests and accidents involving alcohol. Each site was required to have "sufficient visibility, access, width, and shoulder space to insure the safety of the public and the officers." Officers were to stop each car approaching the checkpoint, identify themselves to the motorist, inform him or her of the purpose for the checkpoint, and ask to see the motorist's driver's license. If an officer observed evidence of drunkenness during this encounter, he or she would advise the driver to pull over for field sobriety tests. Drivers who did not appear intoxicated were to be permitted to proceed. The final version of the Seattle Police Sobriety Checkpoint Program was embodied in the roll–call instructions which were read to the participating officers.

In practice, police operated in close compliance with the roll–call instructions. The checkpoints were conducted during late evening and early morning hours, traditionally a time for many DWI arrests. Each checkpoint lasted for about an hour. From December 20, 1983, to January 1, 1984, police conducted checkpoints at 11 different locations. These checkpoints were preceded by some publicity, although the exact time and location of the stops were not specified in advance. From January 7, 1984, to January 22, 1984, four more checkpoints were conducted, this time without any advance publicity.

During the entire checkpoint program a total of 2,412 persons were stopped. Twenty–two (or less than 1 percent) were arrested for DWI, ninety–nine were charged with driving without a license, and nine were given other citations or arrests. The fact that only some checkpoints were publicized did not appear to affect the number of arrests.

Plaintiff C. Steven Fury was stopped at 11:45 p.m., December 31, 1983, at a checkpoint on Westlake Avenue

North. An officer asked him for his driver's license. Fury produced it, and was then told he could proceed. Disturbed by the checkpoints, Fury and five other motorists brought this declaratory and injunctive action in superior court to stop the checkpoint program and to have it declared unconstitutional. Transcripts from earlier criminal proceedings on the same issues were incorporated into the record.

Included in the transcripts was the testimony of the City's expert witness, Robert B. Voas, director of alcohol programs at the National Public Services Research Institute. Voas opined that checkpoints were the most effective way to decrease alcohol–related traffic accidents:

> My observation of the checkpoints and the data that I have from the checkpoints show that the officers at checkpoints contact and impact a much larger group of drivers, and it is my belief—because what we must achieve is an impact of the apprehension of the belief that you are going to get arrested—that it is very important to contact a very high proportion of the drivers who are out on the roadway between 10:00 p.m. and 4:00 a.m., the highest drinking hours.
>
> . . .
>
> The drinking driver typically believes that he will not be stopped. He believes that he can drive successfully, and he sits on the barstool and, therefore, he is not deterred from getting out in his car. The effect of a checkpoint is to stop everyone and to give personal experiences at a much higher rate. By that, you stop hundreds each night in a checkpoint as compared to only a very few.
>
> It is my view that this stopping and giving the personal experience is at least as important, if not more important, than the number of arrests you make. So, on that basis I believe that the checkpoint is a more effective procedure for enforcing drinking driving laws than the traditional patrol I've described.

After considering the record, the trial court granted summary judgment in favor of the plaintiffs, holding that the checkpoint program as conducted was invalid under article

1, section 7 of the state constitution.[2]

## FOURTH AMENDMENT

We begin our analysis, however, with the United States Constitution. Stopping motorists at a checkpoint, for even a brief length of time, constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). As with all searches and seizures conducted without warrants, the courts determine the constitutionality of DWI checkpoints by balancing the legitimate government interests involved against the degree of intrusion on the individual's constitutional rights. *See Brown v. Texas,* 443 U.S. 47, 50–51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979).

The United States Supreme Court has not ruled on the constitutionality of roadblocks set up to detect drunk drivers. However, in *United States v. Martinez–Fuerte,* 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976), it held that permanent checkpoints, located near the Mexican border, were permissible to check for the smuggling of illegal aliens. The Court held that motorists could be stopped without probable cause or reasonable suspicion because the intrusion caused by a well publicized and permanent checkpoint did not outweigh the state interest in enforcing the immigration laws, especially in light of the proven effectiveness of the checkpoints. On the other hand, in *Delaware v. Prouse, supra,* the Court held that spot checks for the purpose of checking driver's licenses and registration were an unreasonable seizure under the Fourth and Fourteenth Amendments. The Court determined that the "marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure". 440 U.S. at 661. The Court was particularly troubled by the

---

[2]The court rejected the argument that RCW 46.64.070 preempts the City's checkpoint program. That issue has been rendered moot by *State v. Marchand,* 104 Wn.2d 434, 706 P.2d 225 (1985), which struck down the statute as unconstitutional.

unbridled discretion given police officers to stop whomever they wished without probable cause. However, the Court added:

This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock–type stops is one possible alternative.

(Footnote omitted.) 440 U.S. at 663.

The only Washington case to date upholding a roadblock or checkpoint is *State v. Silvernail,* 25 Wn. App. 185, 605 P.2d 1279, *cert. denied,* 449 U.S. 843 (1980), *overruled on other grounds in State v. McKim,* 98 Wn.2d 111, 653 P.2d 1040 (1982). In *Silvernail,* we upheld a roadblock to search all vehicles departing from a ferry when the police had probable cause to believe that the perpetrators of a felony were on the ferry and where there was a "reasonable likelihood of success."

Several state courts have considered the validity of drunk driving roadblocks under the Fourth Amendment. Most have held such procedures to be constitutional. *See, e.g., State v. Superior Court,* 143 Ariz. 45, 691 P.2d 1073 (1984); *State v. Golden,* 171 Ga. App. 27, 318 S.E.2d 693 (1984); *People v. Bartley,* 109 Ill. 2d 273, 486 N.E.2d 880 (1985), *cert. denied,* ___ U.S. ___, 89 L. Ed. 2d 608, 106 S. Ct. 1384 (1986); *State v. Garcia,* ___ Ind. App. ___, 489 N.E.2d 168 (1986); *State v. Riley,* 377 N.W.2d 242 (Iowa Ct. App. 1985); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983); *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984); *Commonwealth v. Trumble,* ___ Mass. ___, 483 N.E.2d 1102 (1985); *People v. Scott,* 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984); *State v. Alexander,* 22 Ohio Misc. 2d 34, 489 N.E.2d 1093 (1985); *Lowe v. Commonwealth,* 230 Va. 346, 337 S.E.2d 273 (1985), *cert. denied,* ___ U.S. ___, 89 L. Ed. 2d 720, 106 S. Ct. 1464 (1986). *See also State v. Jones,* 483 So. 2d 433 (Fla. 1986) (striking down the DWI roadblock program before the court, but giving approval to

future programs if a law enforcement agency were to make a favorable showing under the balancing test set forth in *Brown v. Texas, supra*); *State v. Martin,* 145 Vt. 562, 496 A.2d 442 (1985) (vacating a trial court's finding that a DWI roadblock program was per se unconstitutional and giving approval to the program if on remand the law enforcement agency were able to show that public interest in the seizure outweighed its intrusion into personal privacy). Other state courts, applying the *Brown v. Texas* balancing test, have struck down particular sobriety checkpoint programs as violative of the Fourth Amendment. *See, e.g., State v. Muzik,* 379 N.W.2d 599 (Minn. Ct. App. 1985); *Webb v. State,* 695 S.W.2d 676 (Tex. Crim. App. 1985), *review granted* (Oct. 8, 1986).

■ Most state courts have applied a balancing test to determine the reasonableness of the seizure. Though variously worded, the test involves the consideration of three criteria: (1) the gravity of the public concern served by the seizure, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty. *See Brown v. Texas, supra* at 50–51; *Lowe v. Commonwealth,* 230 Va. at 350; *State v. Superior Court,* 691 P.2d at 1076. In determining whether a sobriety roadblock meets the constitutional balancing test, numerous factors should be considered:

(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.

*State v. Deskins,* at 541. *Accord, State v. Jones,* 483 So. 2d at 437, 439.

## I
### PUBLIC CONCERN

The first element of the test is the gravity of the public concerns served by the checkpoint programs. The City's expert below testified that 51 percent of fatally injured drivers in Washington who were measured for blood alcohol content (BAC) had a BAC of .10 percent or greater. As the United States Supreme Court stated in *South Dakota v. Neville,* 459 U.S. 553, 558–59, 74 L. Ed. 2d 748, 103 S. Ct. 916 (1983):

> The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. *See Breithaupt* v. *Abram,* 352 U. S. 432, 439 [1 L. Ed. 2d 448, 77 S. Ct. 408, 412] (1957) ("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate* v. *Short,* 401 U. S. 395, 401 [28 L. Ed. 2d 130, 91 S. Ct. 668, 672] (1971) (Blackmun, J., concurring) (deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez* v. *Campbell,* 402 U. S. 637, 657, 672 [29 L. Ed. 2d 233, 91 S. Ct. 1704, 1715, 1722] (1971) (Blackmun, J., concurring) (footnote omitted) ("The slaughter on the highways of this Nation exceeds the death toll of all our wars"); *Mackey* v. *Montrym,* 443 U. S. 1, 17–19 [61 L. Ed. 2d 321, 99 S. Ct. 2612, 2620–21] (1979) (recognizing the "compelling interest in highway safety").

The problem posed by drivers under the influence is so serious that we hold, as have other jurisdictions, that the public interest is compelling and will therefore justify some intrusion on the unfettered movement of traffic in order to detect and deter drunk driving. *See, e.g., People v. Bartley,* 109 Ill. 2d at 285–86; *People v. Scott,* 473 N.E.2d at 4; *Little v. State,* 479 A.2d at 912.

## II
### EFFECTIVENESS

The effectiveness of the checkpoints is controversial. At least one state has struck down sobriety checkpoints under the Fourth Amendment in part because the State had failed to show that roadblocks were a better method of combating the drunk driving problem than other less intrusive measures. *Webb v. State,* 695 S.W.2d at 682. Other states have found effectiveness based on statistical data. *See, e.g., State v. Superior Court,* 691 P.2d at 1076–77. In *People v. Scott, supra,* the New York court relied primarily upon predictions as to the deterrent effect of checkpoints and a significant decline in alcohol–related accidents during the previous 3 years. The court noted:

> The extent to which those results stem from legislative reforms during that period as distinct from the deterrent effect of roadblocks and other educational and public information programs aimed at combatting the problem is not revealed, but in our view is not of constitutional moment. It is enough that such checkpoints, when their use becomes known, do have a substantial impact on the drunk driving problem . . .

*People v. Scott,* at 528.

Proponents and detractors of roadblocks have attempted to measure their effectiveness in several ways. The Seattle Police Department calculated that there were 2.5 DWI arrests per man–day at the checkpoints, compared with 1.1 arrests per man–day by the 1983 DWI patrol. On the other hand, the plaintiffs point out that less than 1 percent of those stopped at checkpoints were arrested, while officers on traditional DWI patrol arrest about 5 percent of persons stopped. Neither set of figures is very telling because each involves totally dissimilar enforcement methods. The checkpoints stop all motorists. In comparison, the DWI patrol stops only those exhibiting outward manifestations of intoxication.

Moreover, sobriety checkpoints are advocated primarily as a deterrent rather than as a method to put drunk drivers

behind bars. Both the publicity surrounding checkpoints and the actual contact with a greater number of motorists are likely to increase the public's expectation that a person driving drunk will be arrested. *See Lowe v. Commonwealth,* 230 Va. at 352–53 ("[T]he deterrent effect of such a highly publicized program is obvious; such a visible project is bound to increase the perceived risk of arrest in the minds of those drunk drivers who are never arrested").

The best way to measure any deterrent effect would be through accident statistics, but these are as yet inconclusive.[3] Nonetheless, "[t]he State is entitled in the interest of public safety to bring all available resources to bear, without having to spell out the exact efficiency coefficient of each component and of the separate effects of any particular component". *People v. Scott, supra* at 528–29. The cost of human life is high; we cannot delay approval of DWI checkpoints and condone the loss of innocent life while the statistics are being developed. *See People v. Bartley,* 109 Ill. 2d at 286; *State v. Alexander,* 489 N.E.2d at 1097–98.

Regarding the effectiveness of checkpoints, we agree with the Supreme Court of Illinois' response to the argument that highly visible patrols assigned to be on watch for erratic types of driving are a more effective means of apprehending drinking drivers:

> We are not persuaded that roadblocks of the kind at issue here lose out in the balancing test for this reason. First, the erratic driver may cause injury to himself or others before he is observed by patrols. Second, the ability of a drunk driver to avoid erratic movements along a roadway does not mean he will be able to respond to an emergency where prompt reflexes may be of great importance. . . . Third, the carnage caused by drinking and then driving is so serious it warrants resort to both types of apprehension—stopping automobiles which are being driven erratically and roadblocks to detect drunken

---

[3]The City notes that "*no fatality accidents and only one serious injury* accident occurred during the period of December 20, 1983, to January 2, 1984, compared to two fatalities and one serious accident in the same period in 1982." This statistic says nothing about the effectiveness of the checkpoint program.

drivers before they drive in an erratic manner.

The National Transportation Safety Board's Safety Study on deterrence of drunk driving recognizes the deterrent potential of drunk–driving roadblocks. The study points out that they preclude drunk drivers from assuming they will escape trouble simply by driving cautiously. In addition, the study points out that sobriety checkpoints are visible aspects that drunk driving is being combated and they afford police the opportunity to observe a larger number of motorists than would be possible during typical patrol procedures. Admittedly the possibility that a driver will face a roadblock on his way home will not discourage all drunk driving, but on the basis of common sense alone one must conclude that many persons aware of that prospect will have second thoughts about driving.

*People v. Bartley,* 109 Ill. 2d at 286–87, *quoted in State v. Garcia,* 489 N.E.2d at 169. Given the program's effectiveness, and the compelling nature of the problem it is designed to cure, the City need not show the necessity for the program, *i.e.,* that it is the least intrusive means of combating the drunk driving problem. *See State v. Garcia,* 489 N.E.2d at 170.

### III
### INTRUSIVENESS

■ Preliminarily, we note that the program's intrusiveness is considered with a view toward protecting individuals' expectations of privacy. However, when one takes to the public highways and sits behind the wheel of a potentially dangerous instrumentality, his expectations of privacy are diminished. *See United States v. Martinez–Fuerte, supra* at 561; *People v. Scott,* 473 N.E.2d at 3. "[O]ne's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." *United States v. Martinez–Fuerte, supra* at 561. Some expectations of privacy do exist in one's automobile; otherwise the Fourth Amendment would have no application where automobiles are involved. However, it is well recognized that the act of driving a car, as opposed to the

secreting of items therein, is subject to close state regulation. *See South Dakota v. Opperman,* 428 U.S. 364, 368, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976). Seattle's checkpoint program is but another form of regulation that controls one on public highways.

We examine the severity of the intrusion on two levels: the "objective" intrusion and the "subjective" intrusion. From the objective standpoint, the focus is on the stop itself, the questioning, and the visual inspection. *See United States v. Martinez–Fuerte, supra* at 558. Seattle's checkpoints are slightly more intrusive, from this standpoint, than checkpoints conducted in states such as Maryland, where drivers were simply handed a brochure describing the checkpoint program, rather than required to produce their driver's licenses. *See Little v. State, supra.* However, the intrusion remains minimal. The stops last a very short period of time. Police are not permitted to conduct a full–blown search; they must confine themselves to that which they can observe while requesting to see drivers' licenses.

In examining the degree of "subjective" intrusion, our focus is on the extent to which the checkpoints generate concern, fright or annoyance on the part of motorists. *United States v. Martinez–Fuerte, supra* at 558; *United States v. Ortiz,* 422 U.S. 891, 895, 45 L. Ed. 2d 623, 95 S. Ct. 2585 (1975). In *Martinez–Fuerte,* the United States Supreme Court found fright and concern to be minimal in cases where the police were given little discretion and motorists knew or were able to obtain knowledge of the reason for the roadblock and its location. 428 U.S. at 558. The Seattle checkpoint program involved a minimum of officer discretion. Checkpoint times and locations were chosen according to statistical predictions of DWI frequency. All cars approaching the checkpoints were stopped according to a specific procedure, and officers were permitted to conduct further testing only if they had probable cause to believe a driver was intoxicated. Supervisory personnel were present at all checkpoints.

However, the locations of the checkpoints were not publicized in advance in all instances. To render the program effective, some degree of surprise as to time and location was necessary. The lack of advance publicity is not fatal where, as in this case, other factors serve to reduce the subjective intrusion. *See State v. Jones,* 483 So. 2d at 439; *State v. Superior Court,* 691 P.2d at 1077.

Two aspects of Seattle's program reduce the degree of subjective intrusion. First, cars approaching the checkpoints were systematically stopped. Drivers had little reason to fear that they had been singled out for discriminatory enforcement. Second, the stops were conducted only by uniformed officers, and always with high regard for motorist safety. The United States Supreme Court has pointed out that these factors minimize the subjective intrusion:

> At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

*United States v. Ortiz, supra* at 894–95, *quoted in United States v. Martinez–Fuerte, supra* at 558. *But see State v. Marchand,* 104 Wn.2d 434, 438, 706 P.2d 225 (1985) (questioning whether "the stopping of *all* traffic is . . . less intrusive to a particular motorist than the stopping of that motorist alone").

In summary, the intrusion at both the subjective and objective levels is minimal. We hold that it is outweighed by the compelling public interest in detecting and deterring drunk driving. The checkpoint program consequently withstands Fourth Amendment scrutiny.

### WASHINGTON STATE CONSTITUTION

Seattle's Sobriety Checkpoint Program is likewise permissible under article 1, section 7 of the Washington State Constitution. In *State v. Gunwall,* 106 Wn.2d 54, 61–62, 720 P.2d 808 (1986), the Washington Supreme Court set forth six nonexclusive neutral criteria to determine

whether, in a given situation, the Constitution of the State of Washington should be considered as extending broader rights to its citizens than does the United States Constitution. Two criteria are pertinent here: (1) preexisting state law and (2) matters of particular state interest or local concern.

First, preexisting Washington case law allows for warrantless seizures without individualized probable cause in certain instances. In *State v. Silvernail*, 25 Wn. App. 185, 190–91, 605 P.2d 1279, *cert. denied*, 449 U.S. 843 (1980), *overruled on other grounds in State v. McKim*, 98 Wn.2d 111, 653 P.2d 1040 (1982), this court upheld a temporary roadblock set up to capture fleeing suspects. The court stated, "we approve the use of roadblocks in proper cases". *Silvernail*, at 190. Unlike here, the officers in *Silvernail* had probable cause to believe that a serious felony had been committed, as well as reliable information as to the means of flight. *Silvernail*, at 191. However, individualized suspicion is not a prerequisite to a constitutional seizure if the seizure is carried out pursuant to a plan embodying neutral criteria that circumscribes the conduct of individual police officers. *Brown v. Texas*, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); *State v. Silvernail, supra* at 188. In the case at bar, the conduct of the police was circumscribed by the nondiscriminatory nature of the stops.

In *State v. Marchand, supra*, the Washington State Supreme Court struck down a statute that authorized driver's license and vehicle equipment spot checks. The statute was held unconstitutional because it gave state patrolmen unbridled discretion and there was no evidence of the spot checks' effectiveness. These infirmities are absent in the instant case.

Under the second applicable *Gunwall* criterion, no matters of state interest or local concern require that our state constitution's heightened privacy protection be extended to invalidate the roadblocks. While article 1, section 7 of our state constitution proscribes the invasion of one's private

affairs without the authority of law, that authority was provided here where the police officers' discretion was carefully circumscribed, the effectiveness of the law enforcement action has been demonstrated, and other safeguards were incorporated in the planning and execution of the program. *See State v. Marchand, supra; State v. Silvernail, supra* at 188–91. *See also State v. Stroud,* 106 Wn.2d 144, 164, 720 P.2d 436 (1986) (Durham, J., concurring); *State v. Gunwall, supra* at 68–69.

## CONCLUSION

Our review of the record reveals that the gravity of the public concern served by the sobriety checkpoint program is amply demonstrated. In the opinions of court after court, mention is made of the carnage caused by drunk drivers that occurs with tragic frequency on our nation's highways.

When operated under its strict limitations and its carefully crafted regulations approved by high level administrators, Seattle's program eliminates any fear of unfettered discretion on the part of police officers.[4] Moreover, the City made a strong showing of the effectiveness of the program and the necessity for its use which justifies the slight intrusion on motorists' privacy.

We reverse the summary judgment, order the injunction dissolved, and grant summary judgment to the City upholding the validity of its Sobriety Checkpoint Program.

RINGOLD, A.C.J., and SWANSON, J., concur.

Reconsideration denied March 3, 1987.

Review granted by Supreme Court July 1, 1987.

---

[4]Our consideration is limited to Seattle's program as it is presently formulated. The time to review changes in the program is when and if any are implemented.