JOINER, Judge.
Tony Dean Connell was convicted of driving under the influence, see § 32-5A-191(a)(2), Ala.Code 1975. The circuit court sentenced Connell to one month in jail. Additionally, the circuit court ordered Connell to pay a $600 fine and court costs, suspended Connell’s driver’s license for 90 days, and ordered Connell to complete the court-referral program.
Before trial Connell moved to suppress all the evidence in this case because, he said, (1) the driver’s license checkpoint (“the checkpoint”) at which Connell was stopped was unconstitutional; (2) “[t]he officers involved [with the checkpoint] did not act within the mandatory guidelines and procedures promulgated by the Alabama Department of Public Safety”; and (3) there “were no legal grounds to detain and subsequently require [Connell] to respond to questions, perform field tests and, thereafter, be directed to submit to a breath test.” (C. 23-24.)
On August 8, 2011, the circuit court held a hearing on Connell’s motion to suppress. At the hearing, the State introduced “State’s Exhibit 2,” which is the Alabama Department of Public Safety’s Policy Order number 25 (“policy order 25”) for “driver license/vehicle inspection.” (C. 163-65.) Policy order 25 details the procedures that are to be used during a checkpoint, including procedures regarding the location and time of a checkpoint, the method of inspection to be used at a checkpoint, and the records to be kept by law enforcement after a checkpoint. With regard to the method of inspection, policy order 25 states, in part:
“When conditions permit, all traffic should be stopped at checkpoints to facilitate adequate inspection of vehicles and driver license information. Troopers will conduct themselves in a professional manner and create the least *1110 amount of inconvenience to motorists as is possible.”
(C. 164.) The method-of-inspection section also details how the officers are to inspect each vehicle and, further, states that officers are to “[cjarefully observe drivers to determine if they are capable of safely operating the vehicle.” (C. 165.)
The State also introduced “State’s Exhibit 1” titled “Assignment List Attachment,” which was created by Sergeant Brent McElvaine and authorized the checkpoint at issue in this case. (C. 162.) The exhibit detailed the date and time the checkpoint was to occur, the location of the checkpoint, the personnel assigned to work the checkpoint, and the “special equipment/supplies needed for assignment.” Additionally, the exhibit identified Corporal Anthony Ricks as the “leader” of the checkpoint. The exhibit also set out the “work assignment special instructions” as follows:
“A seatbelt/equipment/DL checkpoint will be conducted in Montgomery County at Wasden Rd and Felder Rd from 8pm-12am. The goal is to reduce crashes by insuring motorist’s are operating vehicles safely, ensure seatbelt usage and to detect impaired drivers. Reduced crashes will result in a reduction in fatalities, injuries and property damage. Assigned personnel should report to Cpl Ricks at 8pm at the assigned location for staging and safety briefing.”
(C. 162.)
Additionally, the State presented testimony that established the following: On May 80, 2010, Sergeant Brent McElvaine, the Post Commander for the Montgomery Highway Patrol Post, organized a eheck-point at the intersection of Wasden Road and Felder Road in Montgomery County. Sergeant McElvaine stated that he organized this checkpoint for the “Take Back our Highway Initiative” and that it was one of several checkpoints that were operated as part of that initiative. Sergeant McElvaine stated that the goal of the checkpoint was to “reduce crashes in the post area” and that troopers were checking the drivers of the vehicles for a driver’s license and that they were also doing an equipment check. Sergeant McElvaine stated that he chose the location of the checkpoint because it was a high traffic area, which, he said, was known for traffic accidents, driving-under-the-influence arrests, and traffic citations.
Sergeant McElvaine stated that he provided the “Assignment List Attachment” to Corporal Anthony Ricks because, he said, Corporal Ricks was the supervising officer assigned to conduct the checkpoint. Sergeant McElvaine stated that, although he was not present at the checkpoint during its operation, he approved the checkpoint and selected the location of the checkpoint. Sergeant McElvaine further testified that he chose the time that the checkpoint was to begin — 8:00 p.m. — but agreed that it was a “target time” rather than a “strict” time.
On cross-examination, Sergeant McEl-vaine stated that no trooper could make changes to the checkpoint without his or Corporal Ricks’s approval.[1] Sergeant McElvaine further stated that there was no advance notice of the checkpoint and that, even though policy order 25 mandates that a record detailing the events at a checkpoint be completed when a check *1111 point is finished, no such record was completed for this checkpoint.
Corporal Anthony Ricks testified that he was in charge of the checkpoint conducted at the intersection of Wasden Road and Felder Road. Corporal Ricks stated that Sergeant McElvaine ordered the checkpoint and provided him with a copy of the operations plan for the checkpoint. Corporal Ricks testified that, although the plan indicated that the checkpoint was to begin at 8:00 p.m., he started the checkpoint between 7:30 p.m. and 8:00 p.m. Corporal Ricks stated that he started early because he “had 7 or 8 troopers sitting there ... [and he] figured it’s better to go ahead and start the checkpoint than just pay the guys to sit beside the road and do nothing.” (R. 22.)
Corporal Ricks described the intersection of Wasden Road and Felder Road as a “T” intersection and explained that they had a minimum of two cars on all three sides of the intersection. Corporal Ricks stated that each law-enforcement vehicle “had [its] blue lights activated” and that each trooper was wearing a yellow, reflective vest. (R. 23.)
Corporal Ricks stated that the procedure for the checkpoint was as follows:
‘What we do, usually there will be a line of troopers standing on the road. We ask for your driver’s license, proof of insurance, that sort of thing, check the tags on the car. If there’s not a problem with the license or insurance, the tags are good, we don’t detect any alcohol or see anything illegal in the car, we have them proceed on.”
(R. 24.) Corporal Ricks testified that sometimes during the checkpoint it becomes necessary to cease cheeking every vehicle because of
“[s]afety[;] [t]raffic will get backed up so far, I’ll stop ... the checkpoint and clear the roadway up before we have an accident. And then we’ll start back up again. But there’s no particular car or whatever. We just clear the total scene, get it totally cleared out and start over.”
(R. 25.) Corporal Ricks stated that this occurs when there is
“too much traffic on that road. It’s backed up. It’s going to back out into the main highway. Usually, what happens, some knuckleheads are impatient. They think it’s a wreck down there. They go to trying to U-turn, do different crazy stuff. So we try to clear it up.”
(R. 25.) Corporal Ricks stated that this safety precaution had to be done once during the checkpoint conducted on March 30, 2010. Corporal Ricks stated that, with the exception of clearing the heavy traffic at the checkpoint for safety reasons, every vehicle that approached the checkpoint was stopped and the same procedure was followed for each vehicle.
On cross-examination, Corporal Ricks stated that he did not have to strictly adhere to Sergeant McElvaine’s orders and that he could use his discretion when needed; for example, Corporal Ricks stated that he could begin the checkpoint at an earlier time or start the checkpoint at a later time. On redirect examination, Corporal Ricks stated that he also had discretion to determine whether it was unsafe to continue the checkpoint and to restart the checkpoint when the unsafe conditions ceased. Corporal Ricks further testified that, although the checkpoint began earlier than Sergeant McElvaine ordered, every vehicle that passed through the checkpoint was stopped — except those vehicles at the checkpoint when the checkpoint had to be cleared for safety reasons.
After the State presented its evidence, the following exchange occurred:
“[Connell’s counsel]: Judge, at this point, I don’t believe there are any fur *1112 ther witnesses that would establish the road block. These are just officers that were working in the field. And my Motion to Suppress is that the road block is unconstitutional under the Fourth Amendment. The Supreme Court in every case in this state and other states have consistently held that guidelines have to be strictly followed. It doesn’t leave any — leaving no — discretion to the officers working in the field. [Corporal] Ricks and Sergeant McElvaine testified that the officers in the field can make changes, do what they need to do, use their discretion, start early, start late. So it’s obvious that the guidelines aren’t strictly followed in this case. He just said that he can make any changes that he deemed necessary. And that’s, exactly, what the Supreme Court says you can’t do.
[[Image here]]
“[Prosecutor]: — what I looked at in response to that, Judge, is that the arbitrariness that the courts have addressed is the arbitrary decision on which vehicles to stop which [Corporal] Ricks indicated was not left to their discretion. Once the checkpoint began, they stopped all cars, conditions permitting, which is what is permitted under their guidelines.”
(R. 36-37.) Thereafter, on August 9, 2011, the circuit court issued a written order denying Connell’s motion to suppress, and the case proceeded to trial.
At trial, the State’s evidence established that, on the evening of March 30, 2010, at approximately 7:52 p.m., Trooper Mary Ann Church stopped Connell as Connell approached the checkpoint. Trooper Church then asked Connell to produce his driver’s license and proof of insurance. Because Trooper Church was also in the process of working with another vehicle, however, Trooper Church asked Connell to pull off to the right-hand side of the road and asked Trooper Chadrick Bright to complete the checkpoint procedure on Connell. Trooper Church also told Trooper Bright that she could “smell an odor of alcohol coming from [Connell’s] vehicle.”
Trooper Bright approached Connell’s vehicle and observed a “box of beer” and a “partial Crown Royal bag” in the vehicle and could smell “the odor of alcohol coming from on or about [Connell].” Trooper Bright then asked Connell if he had been drinking, and, according to Trooper Bright, Connell stated that he had consumed “a couple of beers.” While speaking with Connell, Trooper Bright noticed that Connell had bloodshot eyes and slurred speech. Trooper Bright then asked Connell to exit his vehicle so that he could perform field-sobriety tests. When Connell exited the vehicle, Trooper Bright observed that Connell was “swaying from side-to-side” and “kept leaning on the car.”
Trooper Bright then instructed Connell on how to perform the following field-sobriety tests: the walk-and-turn test, the one-legged-stand test, and the finger-count test. According to Trooper Bright, Con-nell failed each of the field-sobriety tests. Trooper Bright then administered a portable breath test to Connell, which, he said, indicated the presence of alcohol on Con-nell’s breath. Trooper Bright then asked Connell “how much alcohol he really had,” to which, according to Trooper Bright, Connell replied that “he didn’t keep count ... [he] may have had four, five, six, seven.”
Trooper Bright then asked Connell about the alcohol that Trooper Bright had observed in the vehicle, and Trooper Bright had Connell remove the “box of beer” from the backseat. According to Trooper Bright, when the box of beer was removed from the backseat he observed a partially consumed open beer can behind *1113 the driver’s seat as well as a styrofoam cup, a bottle of Sprite, and a partially consumed bottle of Crown Royal. Trooper Bright, based on his observations, determined that Connell could not safely operate his vehicle and arrested Connell for driving under the influence.
Trooper Bright then took Connell to the Montgomery County Jail and, after explaining “implied consent” to Connell, attempted to administer the Draeger test to Connell to determine his blood-alcohol content; Connell, however, refused.
After the State rested, both parties presented closing arguments, and the circuit court charged the jury. The jury returned a guilty verdict for driving under the influence. Connell then filed a motion for a new trial, arguing that this Court’s decision in Ogburn v. State, 104 So.3d 267 (Ala.Crim.App.2012), mandated that the circuit court grant Connell’s motion to suppress. The circuit court, however, denied Connell’s motion for a new trial.
On appeal, Connell contends that the checkpoint at which he was stopped was unconstitutional because, he says, “an officer working in the field was conducting the checkpoint with unlimited discretion.” Specifically, Connell alleges that
“there was no evidence of a plan that placed explicit, neutral limitations on the conduct of the officers. In fact, the evidence presented established that no limitations were placed on the officers working in the field. Thus, the State failed to prove that the checkpoint at which Connell was stopped was reasonable under the Fourth Amendment.”
(Connell’s brief, p. 11.)
Initially, we recognize that
“ ‘ “[w]hen evidence is presented ore ten-us to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); “[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,” Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986); and we make “ ‘all the reasonable inferences and credibility choices supportive of the decision of the trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761. “[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court.... Absent a gross abuse of discretion, a trial court’s resolution of [such] conflict[s] should not be reversed on appeal.” Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993) (citations omitted). However, “ ‘[wjhere the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the [appellate] Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.’ ” State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980). ““‘[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.” ’ ” Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004), quoting Hill, 690 So.2d at 1203, quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995). A trial court’s ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. See State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000).’ ”
C.B.D. v. State, 90 So.3d 227, 237 (Ala.Crim.App.2011) (quoting State v. Hargett, 935 So.2d 1200, 1203-04 (Ala.Crim.App.2005)).
*1114 This Court has long held that license checks, sobriety checkpoints, and roadblocks are not intrinsically unconstitutional. McInnish v. State, 584 So.2d 935, 936 (Ala.Crim.App.1991). In order for a checkpoint to be constitutionally permissible, the stop must be reasonable. Hagood v. Town of Town Creek, 628 So.2d 1057, 1059 (Ala.Crim.App.1993). In Cains v. State, 555 So.2d 290 (Ala.Crim.App.1989), this Court held that stops of vehicles at fixed checkpoints are reasonable if they are performed according to a neutral and objective plan, are supported by strong public interest, and are minimally intrusive to the individual being stopped. Essentially, the particular purpose or interest must sufficiently outweigh the invasion of privacy resulting from the checkpoint stop. See Hagood, 628 So.2d at 1062. In Cains, this Court adopted the balancing test set forth in Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), to determine whether a seizure is unreasonable. Cains, 555 So.2d at 294. This balancing test involves
“ ‘[a] weighing of [1] the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.’ ”
Cains, 555 So.2d at 294 (quoting Brown, 443 U.S. at 50-51). The United States Supreme Court has extended the application of this balancing test beyond the traditional arrest situation to roadblock-type stops and specifically to “sobriety checkpoints.” Michigan Dep’t of State Police v. Sitz, 496 U.S. 444, 448-49, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
When evaluating the Brown three-prong balancing test, the United States Supreme Court has held that driver’s license checkpoints satisfy the first prong — that “the gravity of the public concerns served by the seizure” outweigh the Fourth Amendment interest of individuals. See Brown, 443 U.S. at 51, 99 S.Ct. 2637. As for the second factor — “the degree to which the seizure advances the public interest” — the Alabama Supreme Court has held:
“[Tjhere is no question that the public has an interest in making sure that drivers of vehicles are properly licensed and that the vehicles they are driving are registered and equipped with safety devices. The Court of Criminal Appeals stated in Hagood:
“ ‘ “The [S]tate[’s] interest in enforcing its registration and licensing laws and the difficulty in enforcing the laws by any other method” ... [has] been held sufficient to outweigh a minor intrusion upon persons stopped at roadblocks conducted for [that] purpose[ ].’ ”
Ex parte Jackson, 886 So.2d 155, 162 (Ala.2004) (quoting Hagood, 628 So.2d at 1060). Thus, both the first and second prongs of the analysis are satisfied; therefore, the constitutionality of a checkpoint turns on the third factor — “the severity of the interference with individual liberty.”
To analyze the third factor we must determine whether the officers conducted the checkpoint in a neutral and objective manner. Essentially, we must determine if the stop was “minimally intrusive to the individual motorist.” To make this determination this Court applies a 13-factor analysis:
“‘(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode *1115 of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.’ ”
Cains, 555 So.2d at 296 (quoting State v. Deskins, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983)). These 13 factors, however, are “not pivotal to determining whether a particular roadblock-type stop is ‘minimally intrusive’ ” but, instead, are “helpful considerations to take into account when determining whether the officers conducted the stop pursuant to an ‘objective standard.’ ” Ex parte Jackson, 886 So.2d at 163.
As stated above, Connell contends that the checkpoint at which he was stopped was unconstitutional because, he says, “an officer working in the field was conducting the checkpoint with unlimited discretion.” To support his claim on appeal, Connell cites this Court’s decision in Ogburn v. State, 104 So.3d 267 (Ala.Crim.App.2012); Ogburn, however, is distinguishable from this ease.
In Ogbum, Trooper Eric Salvador stopped Ogburn at a checkpoint and came to believe that Ogburn had been driving his vehicle under the influence of alcohol.
“Concerning the procedures that were used when a vehicle was stopped at the checkpoint, Trooper Salvador testified that, after a vehicle pulled up to the checkpoint, an officer would ask the driver to present his or her driver’s license and proof of insurance. If the driver could produce a valid license and proof of insurance and if the officer did not suspect that the driver was under the influence of alcohol, the vehicle was allowed to proceed through the checkpoint. Defense counsel asked Trooper Salvador: ‘If an automobile is approaching the roadblock and comes up to it and you notice that it’s one of our local circuit judges, did you have the authority and discretion to wave them on through and not ask for that?’ (R. 24.) Trooper Salvador responded: ‘I’d check everybody, sir.’ (R. 25.) Defense counsel then asked: ‘But did you have the discretion to wave them through?’ (Id.) Trooper Salvador responded: Tes, sir. I would assume so.’ (Id.)
[[Image here]]
“At trial, Corporal Jesse Thornton, a supervisor -with the Alabama State Troopers, was asked: ‘Do the troopers have any established policies in regards to establishing the checkpoint?’ (R. 6.) Corporal Thornton answered: ‘We do.’ (Id.) However, Corporal Thornton did not give any further testimony concerning those policies. Corporal Thornton further testified that he was involved with the checkpoint at which Ogburn was stopped on July 2, 2011. Corporal Thornton’s main duty that day was field supervision. Corporal Thornton stated that over the 4th of July weekend, the troopers conducted several sobriety checkpoints in an effort to deter drunk driving. Corporal Thornton determined the location of the checkpoint at which Ogburn was stopped. Corporal Thornton stated that he chose the location of the checkpoint based on safety and on the fact that the location was in a heavily traveled area. Corporal Thornton testified that the purpose of the checkpoint was to deter crashes caused by impaired drivers and to check for driver’s license and/or insurance violations. Corporal Thornton stated that the location was visible to motorists; that vehicles that were stopped at the checkpoint were able to pull out of the stream of *1116 traffic without causing significant interruption to the flow of traffic; and that the troopers used typical emergency equipment to warn oncoming motorists of the checkpoint. Corporal Thornton stated that the troopers working at the checkpoint were wearing reflective vests and were using flashlights. Corporal Thornton testified that approaching motorists could see the troopers’ vehicles and that the blue lights of the vehicles were flashing. Corporal Thornton stated that the officers stopped every vehicle that came through the checkpoint.
“The State introduced a ‘vehicle checkpoint’ form that documented the July 2 checkpoint. The form stated that Corporal Thornton approved the checkpoint, and the form was signed by him. The form further stated that the approved location for the checkpoint was on Friendship Road at Cherokee Trail in Elmore County. The form stated that the checkpoint started at 9:00 p.m. and ended at 11:00 p.m. and that the weather conditions during the checkpoint were clear and warm. The form also listed the officers who were assigned to the checkpoint and the enforcement activity that occurred at the checkpoint. Lastly, the form stated that it was submitted by Trooper Salvador. Corporal Thornton testified that the form was created after the checkpoint had ended but that the time and location of the checkpoint and the officers assigned to the checkpoint were determined before the checkpoint started.”
104 So.Sd at 268-69.
This Court, applying the above-discussed principles with regard to checkpoint stops, held that “the State did not carry its burden of proving the reasonableness of the checkpoint stop. Specifically, the State did not present evidence showing that the checkpoint was ‘carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.’ ” Ogburn, 104 So.3d at 274. Furthermore, this Court explained that,
“[a]lthough we hold today that a written plan is not required by the Fourth Amendment, we strongly suggest that having a previously established plan that is in writing before the execution of the checkpoint is the best practice. If no 'previously established written plan is submitted into evidence, a witness for the State must specifically articulate the full details of the previously established plan that limits the discretion of the individual officers at the checkpoint in accordance with Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).”
Ogburn, 104 So.3d at 275 (emphasis added). Thus, Ogbum stands for the proposition that the State, in sobriety-checkpoint challenges, has the burden of establishing the existence of a “plan embodying explicit, neutral limitations on the conduct of individual officers,” 104 So.3d at 274, and that the State may do so by either submitting a previously established written plan into evidence or by eliciting oral testimony of a witness who can “articulate the full details of the previously established plan.” 104 So.3d at 275.
Although Connell contends that his “case involves a checkpoint almost identical to the one in Ogbum,” here, unlike in Ogbum, the State introduced evidence of a previously established written plan and also introduced testimony articulating the details of the written plan.
Specifically, the State introduced policy order 25, which details the procedure for conducting a checkpoint, including regulations regarding the location and time of the checkpoint, the method of inspection to be used at the checkpoint, and the records to be kept by law enforcement after a *1117 checkpoint. With regard to the method of inspection, policy order 25 provides, in part, as follows:
“When conditions permit, all traffic should be stopped at checkpoints to facilitate adequate inspection of vehicles and driver license information. Troopers will conduct themselves in a professional manner and create the least amount of inconvenience to motorists as is possible.”
(C. 164.) The method-of-inspection section also details how the officers are to inspect each vehicle and, further, provides that officers are to “[c]arefully observe drivers to determine if they are capable of safely operating the vehicle.” (C. 165.)
The State also introduced a document entitled “Assignment List Attachment,” which was created by Sergeant McElvaine and authorized the checkpoint at issue in this case. (C. 162.) The document set out the date and time the checkpoint was to occur, the location of the checkpoint, the personnel assigned to work the checkpoint, the “special equipment/supplies needed for assignment,” and the purpose of the checkpoint. Additionally, the exhibit identified Corporal Ricks as the “leader” of the checkpoint.
In addition to the written guidelines for the checkpoint at issue in this case, the State presented oral testimony from Corporal Ricks. Corporal Ricks testified that Sergeant McElvaine ordered the checkpoint and provided him with a copy of the operations plan for the checkpoint. Corporal Ricks explained that the intersection of Wasden Road and Felder Road is a “T” intersection and that they had a minimum of two cars on all three sides of the intersection. Corporal Ricks further stated that each law-enforcement vehicle at the checkpoint “had [its] blue lights activated” and that each trooper was wearing a yellow, reflective vest. (R. 23.) Corporal Ricks stated that, at some point during the checkpoint, he ordered that all the cars currently in the checkpoint be allowed to proceed through the checkpoint without stopping because of
“[s]afety[;] [t]raffic will get backed up so far, I’ll stop ... the checkpoint and clear the roadway up before we have an accident. And then we’ll start back up again. But there’s no particular car or whatever. We just clear the total scene, get it totally cleared out and start over.”
(R. 25.) That occurred, he said, because there was
“too much traffic on that road. It’s backed up. It’s going to back out into the main highway. Usually, what happens, some knuckleheads are impatient. They think it’s a wreck down there. They go to trying to U-turn, do different crazy stuff. So we try to clear it up.”
(R. 25.) Corporal Ricks stated that, -with the exception of clearing the heavy traffic at the checkpoint for safety reasons, every vehicle that approached the checkpoint was stopped and the same procedure was followed for each vehicle.
Although Connell correctly recognizes that Corporal Ricks began the checkpoint before the stated time in the written guidelines and that Corporal Ricks stated that he had discretion to keep the checkpoint open longer than authorized, those facts, alone, are not sufficient to establish that the checkpoint was not carried out pursuant to a “plan embodying explicit, neutral limitations on the conduct of individual officers.” Ogburn, 104 So.3d at 274.
For example, the checkpoint at issue in Cains v. State, supra, was upheld as constitutional even though “officers in the field” — not a supervising officer — chose the “site, time, and duration of the roadblock.” 555 So.2d at 297. In Cains, this Court explained:
*1118 “While the operation of a roadblock undoubtedly bears on its reasonableness, reliance on the purely mechanical aspects of roadblock operation can lead to results which appear to elevate form over substance. For example, some courts have found roadblock stops invalid because, among other things, safety devices such as ‘flares, flashing lights or signs’ were not used. See, e.g., Jones v. State, 459 So.2d 1068, 1079 (Fla.Dist.Ct App.1984). Other courts have upheld roadblocks in part because safety measures such as approach signs and traffic cones were employed, see, e.g., State v. Superior Court In and For Pima County, 143 Ariz. 45, 691 P.2d 1073, 1076 (1984).
“While such considerations are not totally irrelevant to the reasonableness of a roadblock, neither are they pivotal to its constitutionality. As the Supreme Court observed in [United States v.] Martinez-Fuerte, ‘Many incidents of checkpoint operation ... must be committed to the discretion of [law enforcement] officials.’ 428 U.S. [543] at 560 n. 13, 96 S.Ct. [3074] at 3084 n. 13 [(1976) ].
“In our judgment, roadblocks operated pursuant to an objective and neutral plan of briefly halting all oncoming traffic are only minimally intrusive to the individual motorist and are thus constitutionally reasonable seizures. The primary reason that the random stops in [United States v.] Brignoni-Ponce [, 422 U.S. 873 (1975),] and [Delaware v.] Prouse [, 440 U.S. 648 (1979),] were condemned, while the checkpoint operations in Martinez-Fuerte and [Brown v. Texas, 443 U.S. 47 (1979),] were approved, had little to do with the relatively minor mechanical operation of either kind of seizure. The approved stops were upheld because they were conducted pursuant to an ‘objective standard,’ Delaware v. Prouse, 440 U.S. at 661, 99 S.Ct. at 1400, and because they ‘both appealed] to and actually involve[d] less discretionary enforcement activity,’ Martinez-Fuerte, 428 U.S. at 559, 96 S.Ct. at 3083. The condemned stops were invalidated because they involved the ‘standardless and unconstrained discretion’ of officers in the field, Delaware v. Prouse, 440 U.S. at 661, 99 S.Ct. at 1400.”
Cains, 555 So.2d at 296. This Court further explained that “in Delaware v. Prouse the [United States Supreme] Court did not insist on a total absence of discretion by officers in the field. Instead, it ‘insisted that the discretion of the official in the field be circumscribed, at least to some extent.’ 440 U.S. at 661, 99 S.Ct. at 1400 (emphasis added).” Cains, 555 So.2d at 297.
Although there was evidence indicating that Corporal Ricks had the authority to exercise limited discretion at the checkpoint, based on the facts presented at the suppression hearing, the circuit court did not err in determining that the checkpoint was valid and constitutional. Corporal Ricks’s discretion was limited when Sergeant McElvaine selected the location of the checkpoint and the purpose of the checkpoint and was further limited by the guidelines set forth in policy order 25, which states:
“When conditions permit, all traffic should be stopped at checkpoints to facilitate adequate inspection of vehicles and driver license information. Troopers will conduct themselves in a professional manner and create the least amount of inconvenience to motorists as is possible.”
*1119 (C. 164.) Thus, policy order 25 required that every vehicle that passed through the checkpoint be stopped, so long as “conditions permit.” When Corporal Ricks made the decision to clear the checkpoint for “safety,” he was merely exercising the limited discretion afforded him through policy order 25.[2] Policy order 25 also limited Corporal Ricks’s discretion because it set forth the details as to how the officers are to inspect each vehicle. (C. 165.)
Based on the record, the circuit court properly determined that the checkpoint in this case was operated in a neutral and objective manner, and the circuit court did not err in denying Connell’s motion to suppress. Therefore, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. Sergeant McElvaine clarified on redirect examination that, although he selects the location of the checkpoint, creates a plan of operation for the checkpoint, and appoints a supervisor for the checkpoint, the checkpoint supervisor is given the authority, under policy order 25, to make changes "[i]f conditions out in the field dictate that certain decisions have to be made” without first seeking Sergeant McElvaine’s approval.

. Moreover, 1 of the 13 factors set forth in Cains is the "maintenance of safety conditions.” When Corporal Ricks cleared the checkpoint, he did so to maintain safety.