BURKE, Judge.
Charles Edward Ogburn, Jr., appeals his conviction for driving under the influence (“DUI”), a violation of § 32-5A-191(a), Ala.Code 1975. Ogburn was sentenced to 90 days in the county jail, which sentence the trial court suspended, and he was placed on probation for 2 years. Og-burn was also ordered to pay a $600 fine and to attend DUI school.
On July 2, 2011, Ogburn was stopped at a traffic checkpoint in rural Elmore County. After Ogburn was stopped, he was approached by Alabama State Trooper Eric Salvador. Trooper Salvador noticed the smell of alcohol coming from Ogburn’s vehicle. Trooper Salvador asked Ogburn for his driver’s license and proof of insurance. At that point, Trooper Salvador noticed some unopened beer containers in the extended cab of Ogburn’s truck. Trooper Salvador asked Ogburn whether he had been drinking alcohol, and Ogburn responded that he had drank “a couple.” (R. 20.) Trooper Salvador then asked Og-burn to pull into the parking lot of a nearby store. Trooper Salvador testified that Ogburn appeared to be under the influence of alcohol.
Concerning the procedures that were used when a vehicle was stopped at the checkpoint, Trooper Salvador testified that, after a vehicle pulled up to the checkpoint, an officer would ask the driver to present his or her driver’s license and proof of insurance. If the driver could produce a valid license and proof of insurance and if the officer did not suspect that the driver was under the influence of alcohol, the vehicle was allowed to proceed through the checkpoint. Defense counsel asked Trooper Salvador: “If an automobile is approaching the roadblock and comes up to it and you notice that it’s one of our local circuit judges, did you have the authority and discretion to wave them on through and not ask for that?” (R. 24.) Trooper Salvador responded: “I’d check everybody, sir.” (R. 25.) Defense counsel then asked: “But did you have the discretion to wave them through?” (Id.) Trooper Salvador responded: “Yes, sir. I would assume so.” (Id.)
*269 After Ogburn pulled into the parking lot of the nearby store, he was approached by another Alabama State Trooper, Kenneth Day. Trooper Day smelled alcohol in Og-burn’s vehicle. Trooper Day asked Og-burn if he had been drinking, and Ogburn admitted that he had drunk alcohol earlier that day. Trooper Day observed that Og-burn’s eyes were red, i.e., bloodshot, and that his breath smelled like alcohol. Based on Trooper Day’s observations, he told Ogburn to get out of the vehicle. Trooper Day testified that after performing four field-sobriety tests, he determined that Ogburn was under the influence of alcohol. Trooper Day then arrested Og-burn for DUI and took him to the Elmore County jail. At the jail, Ogburn was administered a breath-alcohol-analysis test by Trooper Day using a Draeger brand device. The test revealed Ogburn’s blood-alcohol level to be .14.
At trial, Corporal Jesse Thornton, a supervisor with the Alabama State Troopers, was asked: “Do the troopers have any established policies in regards to establishing the checkpoint?” (R. 6.) Corporal Thornton answered: “We do.” (Id.) However, Corporal Thornton did not give any further testimony concerning those policies. Corporal Thornton further testified that he was involved with the checkpoint at which Ogburn was stopped on July 2, 2011. Corporal Thornton’s main duty that day was field supervision. Corporal Thornton stated that over the 4th of July weekend, the troopers conducted several sobriety checkpoints in an effort to deter drunk driving. Corporal Thornton determined the location of the checkpoint at which Ogburn was stopped. Corporal Thornton stated that he chose the location of the checkpoint based on safety and on the fact that the location was in a heavily traveled area. Corporal Thornton testified that the purpose of the checkpoint was to deter crashes caused by impaired drivers and to check for driver’s license and/or insurance violations. Corporal Thornton stated that the location was visible to motorists; that vehicles that were stopped at the checkpoint were able to pull out of the stream of traffic without causing significant interruption to the flow of traffic; and that the troopers used typical emergency equipment to warn oncoming motorists of the checkpoint. Corporal Thornton stated that the troopers working at the checkpoint were wearing reflective vests and were using flashlights. Corporal Thornton testified that approaching motorists could see the troopers’ vehicles and that the blue lights of the vehicles were flashing. Corporal Thornton stated that the officers stopped every vehicle that came through the checkpoint.
The State introduced a “vehicle checkpoint” form that documented the July 2 checkpoint. The form stated that Corporal Thornton approved the checkpoint, and the form was signed by him. The form further stated that the approved location for the checkpoint was on Friendship Road at Cherokee Trail in Elmore County. The form stated that the checkpoint started at 9:00 p.m. and ended at 11:00 p.m. and that the weather conditions during the checkpoint were clear and warm. The form also listed the officers who were assigned to the checkpoint and the enforcement activity that occurred at the checkpoint. Lastly, the form stated that it was submitted by Trooper Salvador. Corporal Thornton testified that the form was created after the checkpoint had ended but that the time and location of the checkpoint and the officers assigned to the checkpoint were determined before the checkpoint started.
After the State rested its case, Ogburn moved for a judgment of acquittal. The trial court denied that motion. The defense did not present any testimony. The trial court found that Ogburn was guilty of *270 DUI. After Ogburn was sentenced, he waived his right to a jury trial and appealed the Elmore District Court’s judgment directly to this Court.
On appeal, Ogburn alleges that the evidence in this case should have been suppressed because, he says, the checkpoint stop violated his constitutional rights under the Fourth Amendment to the United States Constitution.[1] Ogburn argues that the State did not carry its burden of proving that his initial stop at the checkpoint was reasonable under the Fourth Amendment. Specifically, Ogburn argues, among other things, that the State did not prove that the checkpoint was “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers,” as required by Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Concerning the reasonableness of his checkpoint stop, Ogburn argues that the State did not meet its burden of proof because, he says, although the State presented evidence that the troopers have policies concerning the establishment of checkpoints, the State did not present any details of those policies, including whether the policies contained any explicit, neutral limitations on the conduct of individual officers. In his brief, Ogburn states:
“Only Trooper Thornton was questioned about the policy that might have existed. Thornton was asked two questions about the existence of any policy, ‘Do the Troopers have any established policies in regard to establishing the checkpoint?’ (R 6) to which he answered, ‘We do,’ and ‘Did you have a policy regarding what vehicles were to be stopped at the checkpoint?’ (Emphasis added) (R 12) Whether these questions were intended to elicit testimony that the Department of Public Safety had a general plan and policy for all roadblocks or whether they were intended to elicit testimony that there was a plan or policy for this particular roadblock, is not clear. However, it is clear that the answer given to the second question was related only to the July 2, 2011, roadblock. ‘This particular checkpoint, I can testify that we checked every vehicle that came through there.’ (R 12) Furthermore, a close analysis of Trooper Thornton’s answers show that he did not even testify that the rule or policy for the July 2, 2011, roadblock was to check every vehicle, he only testified that they checked every vehicle.”
Ogburn’s brief, at 25-26.
Concerning Ogburn’s contention that the State did not present evidence showing that the checkpoint was carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers, the State appears to first argue that Ogburn failed to preserve this issue for appellate review. State’s brief, at 23-26. However, at trial, when the State first attempted to introduce evidence concerning Ogburn’s stop at the checkpoint, Ogburn’s attorney objected and moved to suppress the evidence, stating:
*271 “I’m going to object at this point for the reason that the only way that this evidence can come in is if it has been established that the roadblock was reasonable and met all U.S. Supreme Court cases. And it is our position that the State has not done that and has completely failed to make that showing. I think the Court is well aware of the cases that say that all roadblocks are presumed to be unlawful unless and until the State produces evidence to show that they are — meet all the requirements. And the State has not shown that. They have not shown it at all. They haven’t introduced a policy for this particular roadblock or a policy in general of the Alabama State Troopers. So we would object as the predicate hasn’t been laid for the testimony that Officer Salvador is giving.”
(R. 18-19.) The trial court denied that objection. (R. 19.)
The objection was made when the State first attempted to introduce the evidence obtained from Ogburn’s stop at the checkpoint, and the objection specifically referenced the alleged failure of the State to introduce a policy for the checkpoint. Therefore, this objection was sufficient to preserve Ogburn’s argument that the State failed to prove that the checkpoint was carried out pursuant to a policy embodying explicit, neutral limitations on the conduct of individual officers.
The State also argues that Ogburn’s contention is without merit. State’s brief, at 26-38. Specifically, the State contends:
“In Cains [v. State, 555 So.2d 290 (Ala.Crim.App.1989) ], this Court stated, ‘In our judgment, roadblocks operated pursuant to an objective and neutral plan of briefly halting all oncoming traffic are only minimally intrusive to the individual motorist and are thus constitutionally reasonable seizures.’ Id. at 296. When a vehicle was stopped at the checkpoint, the officers requested the driver to produce his or her driver’s license and proof-of-insurance. (R. 28) If the driver produced a valid driver’s license and current proof-of-insurance, and the officers ‘didn’t suspect that they were under the influence of alcohol,’ the driver continued on his or her way. (R. 24) While it is true, as Ogburn argues, that Trooper Salvador testified that he ‘would assume’ that the officers had the discretion to permit a local circuit judge to pass through the checkpoint without submitting to a driver license and proof-of-insurance check, Trooper Salvador also said, ‘I’d check everybody.’ (R. 24-25) Indeed, the reality is that every car that approached the checkpoint was stopped. (R. 11-12)
“The troopers’ testimony established that the checkpoint was ‘operated pursuant to an objective and neutral plan of briefly halting all oncoming traffic,’ was ‘only minimally intrusive to the individual motorist,’ and was thus ‘constitutionally reasonable.’ Cains, 555 So.2d at 296. Therefore, Ogburn’s claim that the State failed to prove that the checkpoint was reasonable under the Brown [v. Texas, 443 U.S. 47 (1979),] test fails.”
State’s brief, at 31-33.
The State further contends:
“First, the State did establish that [the Department of Public Safety] had a policy regarding checkpoints. (R. 6) Moreover, as discussed above, the checkpoint in this case was reasonable. It was established to deter drunk driving, a legitimate public interest; it was a reasonable method of advancing the State’s legitimate interest; and it was operated pursuant to a neutral and objective plan that caused minimal intrusion to those drivers who were required to stop. Thus, while the State did not *272 present evidence specifically setting out that [the Department of Public Safety] had a written policy concerning the establishment and conduct of sobriety checkpoints or the details of the policy that did exist, the trial court properly denied Ogburn’s objection to the evidence stemming from his initial stop at the checkpoint. See Stone [v. State], 705 So.2d [1316,] 1319 [ (Ala.Crim.App.1996) ]. Therefore, this Court should affirm the judgment of the trial court.”
State’s brief, at 40-41.
Concerning the constitutionality of a stop at a checkpoint, in Ex parte Jackson, 886 So.2d 155 (Ala.2004), the Alabama Supreme Court stated:
“ ‘[Shopping an automobile and detaining its occupants constitute a “seizure” within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief.’
“Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
[[Image here]]
“In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court created a three-prong balancing test for determining whether a seizure is considered reasonable. In that case, the question was whether the officers’ detention of a pedestrian, who, in violation of a Texas statute, refused to identify himself, was an unreasonable ‘seizure.’
“ ‘Consideration of the constitutionality of such seizures involves a weighing of [1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.’
“443 U.S. at 50-51, 99 S.Ct. 2637. In Michigan Department of State Police v. Sitz, 496 U.S. 444, 448-49, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court extended the application of these three conditions beyond the traditional arrest situation to roadblock-type stops, specifically to ‘sobriety checkpoints.’ The United States Supreme Court has explicitly upheld roadblock-type stops against constitutional challenges in four situations — stops gathering information concerning a recent crime in the area when the questions asked during the stop did not seek self-incriminating information; stops checking driver’s licenses; drivers’ sobriety; and the presence of illegal aliens. See Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004); Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); Sitz, supra; and [United States v.] Martinez-Fuerte[, 428 U.S. 543 (1976) ]. The Alabama Court of Criminal Appeals ably summarized the United States Supreme Court precedent as to this issue in Cains v. State, 555 So.2d 290 (1989):
“ ‘Generally, a seizure less intrusive than a traditional arrest is reasonable if based on individualized suspicion, gathered from specific and articulate facts, that the individual is, or is about to be, engaged in criminal activity, Terry v. Ohio[, 392 U.S. 1 (1968)]; see also United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), or if the seizure is “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers,” Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).
“ ‘The nature of a roadblock requires the stopping of cars without *273 individualized suspicion of wrongdoing. Thus, if a roadblock stop is to be upheld, it must be on the second basis, ie., because it is “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.” In a series of decisions stemming from the immigration control cases, the United States Supreme Court has rejected the individualized suspicion requirement for fixed, non-random automobile checkpoints or roadblock stops, and instead has established some criteria for “a plan embodying explicit, neutral limitations on the conduct of individual officers.”
[[Image here]]
‘“Four years [after the Supreme Court’s decision in Delaware v. Prouse, 440 U.S. 648 (1979)], the Court specifically approved drivers’ license checkpoints in Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)....
“ When read together, [United States v.] Brignoni-Ponce[, 422 U.S. 873 (1975) ], [United States v.] Martinez-Fuerte[, 428 U.S. 543 (1976)], Prouse, and Texas v. Brown[, 460 U.S. 730 (1983),] stand for the proposition that random stops or spot checks are unreasonable in the absence of individualized suspicion of wrongdoing; on the other hand, stops at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist.’
“555 So.2d at 292-93 (emphasis added).
“The United States Supreme Court has held that driver’s license checkpoints satisfy the first factor — that ‘the gravity of the public concerns served by the seizure’ outweigh the Fourth Amendment interest of individuals. See Brown v. Texas, 443 U.S. at 51, 99 S.Ct. 2637; Texas v. Brown, supra. As for the second factor — ‘the degree to which the seizure advances the public interest’ — there is no question that the public has an interest in making sure that drivers of vehicles are properly licensed and that the vehicles they are driving are registered and equipped with safety devices. The Court of Criminal Appeals stated in Hagood [v. Town of Town Creek, 628 So.2d 1057 (Ala.Crim.App.1993) ]:
“ ‘ “The state’s interest in enforcing its registration and licensing laws and the difficulty in enforcing the laws by any other method” ... [has] been held sufficient to outweigh a minor intrusion upon persons stopped at roadblocks conducted for [that] purpose[ ].’
“628 So.2d at 1060. Because the United States Supreme Court in Texas v. Brown, supra, has specifically upheld driver’s license checkpoints as advancing the public interest, thus satisfying the second factor, we must ensure that in [the defendant]’s case the State satisfied the third factor.
“To analyze the third factor — ‘the severity of the interference with individual liberty’ — -we must determine whether the officers conducted the roadblock-type stop in a neutral and objective manner. As the Court of Criminal Appeals stated in Cains: ‘[S]tops [of vehicles] at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist.’ 555 So.2d at 293. We must determine if the stop in Jackson’s ease was ‘minimally intrusive *274 to the individual motorist.’ The Court of Criminal Appeals stated in Cains [v. State, 555 So.2d 290 (Ala.Crim.App.1989),] that ‘the manner of operation and the physical characteristics of a roadblock,’ 555 So.2d at 296, affect the intrusiveness of the stop. The Court of Criminal Appeals then quoted a 13-fac-tor analysis adopted by the Kansas Supreme Court:
“ ‘ “(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.” ’
“555 So.2d at 296 (quoting State v. Deskins, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983)). We agree with the Court of Criminal Appeals that we should not exalt form over substance and that some of the 13 factors outlined above are not pivotal to determining whether a particular roadblock-type stop is ‘minimally intrusive.’ However, those factors are helpful considerations to take into account when determining whether the officers conducted the stop pursuant to an ‘objective standard.’
“We also agree with the Court of Criminal Appeals that because a roadblock-type stop to examine driver’s licenses is warrantless and not based on an ‘articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered,’ Prouse, 440 U.S. at 663, 99 S.Ct. 1391, the State has the burden of proving that it was reasonable under the Fourth Amendment. Hagood, 628 So.2d at 1062.”
Ex parte Jackson, 886 So.2d at 161-63.
In Hagood v. Town of Town Creek, 628 So.2d 1057 (Ala.Crim.App.1993), in holding that the roadblock at issue was unconstitutional, this Court found that the police officers had conducted the roadblock with “unfettered” discretion. This Court also found it highly relevant that there was no written policy that could have limited the officers’ discretion, and this Court found it irrelevant that the police chief himself was one of the officers in the field. Hagood, 628 So.2d at 1061-62.
In the present case, the State did not carry its burden of proving the reasonableness of the checkpoint stop. Specifically, the State did not present evidence showing that the checkpoint was “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.” Although highly relevant to deciding whether a checkpoint was reasonable, we find that written guidelines are not a mandatory requirement of a constitutional checkpoint. See Ex parte Jackson, supra; Stone v. State, 705 So.2d 1316, 1318-19 (Ala.Crim.App.1996) (holding that although there were no written guidelines in place at the time of the defendant’s checkpoint stop, the stop was constitutional); Hagood, 628 So.2d at 1061 (noting that written guidelines are a “prominent factor,” but only one factor, to be considered in determining the reasonableness of a roadblock). However, to satisfy the reasonableness requirement of the Fourth Amendment, the State must pres *275 ent evidence showing that the checkpoint was carried out pursuant to a previously established objective and neutral plan that was designed by higher ranking personnel to limit the conduct of the officers in the field.
Although we hold today that a written plan is not required by the Fourth Amendment, we strongly suggest that having a previously established plan that is in writing before the execution of the checkpoint is the best practice. If no previously established written plan is submitted into evidence, a witness for the State must specifically articulate the full details of the previously established plan that limits the discretion of the individual officers at the checkpoint in accordance with Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
In the present situation, not only is there no evidence of written guidelines that could have limited the officers’ discretion, there is no other evidence of a plan that placed explicit, neutral limitations on the conduct of the officers. Corporal Thornton testified that the troopers have established policies concerning the establishment of checkpoints, but he did not give any testimony concerning the substance of those policies or concerning how those policies placed explicit, neutral limitations on the conduct of the officers working the checkpoint. The State also presented evidence concerning the way the officers actually carried oút the checkpoint in the present case, but the State did not present any evidence concerning whether the way the officers carried out the checkpoint was in accordance with a plan embodying explicit, neutral limitations on the officers’ conduct. There is simply no evidence indicating that the officers in the field were given any particular instructions before the checkpoint began concerning how they were to conduct the checkpoint or concerning the extent of their discretion. The only specific evidence concerning the officers’ discretion was the testimony of Trooper Salvador who testified that, although he in fact stopped every vehicle that passed through the checkpoint, he assumed that he had the discretion to allow a circuit judge to pass through the checkpoint without being stopped. Furthermore, there is no evidence indicating that the officers’ discretion at the checkpoint was supervised by any official that was not in the field.
The primary wrong that the Fourth Amendment seeks to prevent is unbridled police discretion. See Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (stating that “[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of ‘reasonableness’ upon the exercise of discretion by government officials, including law enforcement agents, in order “‘to safeguard the privacy and security of individuals against arbitrary invasions” ’ ”) (citation omitted). In the present case, the State did not present any evidence of the limits on the field officers’ discretion. Therefore, the warrantless stop of Ogburn at the checkpoint without any individualized suspicion of wrongdoing was unreasonable; thus, the evidence obtained pursuant to that stop should have been suppressed. Without that evidence, there is no evidence to support Ogburn’s conviction for DUI. Accordingly, we reverse the trial court’s judgment and render a judgment of acquittal for Ogburn.
REVERSED AND JUDGMENT RENDERED.
WINDOM, P.J., and WELCH, J., concur. JOINER, J., dissents, with opinion. KELLUM, J., joins in dissent.

. The Fourth Amendment to the United States Constitution provides:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”
The United States Supreme Court has held that the protections of the Fourth Amendment extend to the states through the operation of the Due Process Clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).