BURKE, Judge.
Cartez Woolen appeals his guilty-plea conviction for unlawful possession of a controlled substance, a violation of § 13A-12-212 (a)(1), Ala.Code 1975, and his resulting sentence of 97 months’ imprisonment; Woolen’s sentence was split, and he was ordered to serve 12 months’ imprisonment, followed by 2 years’ supervised probation. Woolen was also ordered to pay $100 to *266 the Crime Victims’ Compensation Fund, $100 to the Forensic Science Trúst Fund, to attend a substance-abuse program, and to surrender his driver’s license.
Before- trial, Woolen made an oral motion to suppress the State’s evidence, alleging that the evidence was seized during an illegal search at a roadblock. Officer Joshua Osborne testified that, on August 20, 2011, he had been assigned to the South Precinct task force that was conducting a roadblock at the intersection of Kappa Avenue and Center Place South. Officer Osborne testified that the task force had been asked to go to that area to conduct a roadblock because of recent violence in the area. Officer Osborne stated that “[t]he roadblock itself was for the purpose of checking driver’s license, insurance, seat belts, make sure there were no drunk drivers, that kind of thing.” (R. 6.) Officer Osborne testified that the officers stopped every car that came through the roadblock and that the officers required proof of insurance and a license from every driver. The officers also checked every tag and registration.
On cross-examination, Officer Osborne explained that one sergeant and approximately six to eight officers participated in the roadblock. When defense counsel asked Officer Osborne whether the purpose of the roadblock was to prevent or deter violence, Officer Osborne stated that “there had just been — in the area is prone to some, you know, so occasionally we would be asked to do these roadblocks just as a visible deterrence, I suppose.” (R. 8.) Officer Osborne stated that, for safety precautions, the roadblock was performed in a well-lit area and that the officers had marked patrol cars with their emergency lights activated to make sure that anyone approaching knew that they were the police. Officer Osborne stated that all the officers were uniformed, were wearing reflective gear, and had flashlights. Officer Osborne testified that he did not have any written guidelines at the exact moment of the roadblock, but it was a verbal assignment and the sergeant supervisor was on the scene as required by their rules and regulations. Officer Osborne testified that there was a lieutenant available at one of the precincts. The record indicates the following transpired:
“[Defense counsel:] If the mayor or Judge Vinson came through [the] roadblock, did ya’ll have the discretion to wave them through?
“[Officer Osborne:] Everyone is stopped. I have no way of knowing who is coming through this. If the president, I suppose, came through, you know, I would probably step out of the way for that. “[Defense counsel:] If you saw the may- or coming up and you recognized him, did you have discretion to wave him through? You did, didn’t you?
“[Officer Osborne:] If I — you know, if I know for sure, considering it’s the may- or, if the mayor drives up or is driven around in an SUV that resembles numerous SUVs, I would have to verify first.
“[Defense counsel:] But if you saw it was the mayor, you wouldn’t ask him for his driver’s license and his insurance, would you?
“[Officer Osborne:] He wouldn’t have been driving, a police officer would have been driving, so I wouldn’t have, no, sir. “[Defense counsel:] Okay. If you recognized the presiding judge of the municipal court of Birmingham who was driving his vehicle, you had the discretion to wave him through, didn’t you?
“[Officer Osborne:] I would have asked for a driver’s license and proof of insurance.
“[Defense counsel:] You would have done that?
*267 “[Officer Osborne:] Absolutely.”
(R. 10-11.) When asked whether he had any explicit “neutral limitations” on his conduct as an officer working the roadblock that were in writing, Officer Osborne stated the following:
“If I understood the question correctly, we don’t have any written guidelines in hand. It’s — you know, it’s not as if a sergeant comes into roll call and hands us a written order, but we do have an oral briefing or the supervisor, you know, that is what we’re going to go do and these are the hours we’re going to do it and the time we’re going to conduct this operation, roadblock, however you care to phrase it, during this time span.”
(R. 12.) Officer Osborne testified that the supervising sergeant had discretion over the roadblock and that, if something happened that he needed to go higher up in command, there was always a duty lieutenant at one of the precincts. Officer Osborne stated that the average length of time that a motorist would be detained if they had their documentation was approximately a minute. According to Officer Osborne, there was no advance notice of the roadblock to the public at large, and, he stated, the roadblocks usually last between 80 and 40 minutes.
Following closing arguments from counsel, the trial court denied Woolen’s motion to suppress, finding that there was sufficient evidence to establish that the stop of Woolen was reasonable. Woolen preserved the issue concerning the suppression of the evidence obtained from a search conducted during the roadblock, and he entered a guilty plea to one count of unlawful possession of a controlled substance.
On appeal, Woolen argues that the stop and his subsequent search and arrest constituted an unlawful, warrantless search and seizure of his person and vehicle in violation of his Fourth Amendment rights.[1] Specifically, Woolen contends that the roadblock in this case was established solely for the impermissible purpose of creating a police presence in a high-violence area as a deterrent of violent crime and, thus, was unconstitutional. Woolen also argues that the roadblock was an unconstitutional stop and seizure because it was not carried out pursuant to a plan embodying explicit neutral limitations on the conduct of the individual officers as required by Ogburn v. State, 104 So.3d 267 (Ala. Crim.App.2012).
“ ‘In reviewing the correctness of the trial court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993) (quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985)). “A trial court’s ruling on a motion to suppress will not be disturbed unless it is ‘palpably contrary to the great weight of the evidence.’ Parker v. State, 587 So.2d 1072, 1088 (Ala.Crim.App.1991).” Rut *268 ledge v. State, 680 So.2d 997, 1002 (Ala. Crim.App.1996). “The trial court’s findings on a motion to suppress will not be disturbed on appeal unless they are clearly erroneous.” Ex parte Matthews, 601 So.2d 52 (Ala.1992).
This Court has repeatedly held that sobriety checkpoints, license checks, and roadblocks are not intrinsically unconstitutional. McInnish v. State, 584 So.2d 935, 936 (Ala.Crim.App.1991). “In order for a roadblock to be constitutionally permissible, the stop must be reasonable.” Hagood v. Town of Town Creek, 628 So.2d 1057, 1059 (Ala.Crim.App.1993). The United States Supreme Court created a three-prong balancing test for determining whether a seizure is considered reasonable, which is as follows:
“Consideration of the constitutionality of such seizures involves a weighing of [1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.”
Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
This Court held that “if a roadblock stop is to be upheld, it must be ... because it is ‘carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.’ ” Cains v. State, 555 So.2d 290, 293 (Ala.Crim.App. 1989) (citing Brown v. Texas, 443 U.S. at 51). Thus, stops of vehicles at fixed roadblocks are reasonable if they are performed pursuant to a “neutral and objective plan, are supported by strong public interest, and are minimally intrusive to the individual motorist.” Id.
In evaluating the first prong in the Brown balancing test, the United States Supreme Court has held that driver’s license checkpoints satisfy the first prong — that “the gravity of the public concerns served by the seizure” outweigh the Fourth Amendment interest of individuals. See Brown, 443 U.S. at 51. In Ex parte Jackson, 886 So.2d 155 (Ala.2004), in regard to the second factor of the Brown balancing test — “the degree to which the seizure advances the public interest” — the Alabama Supreme Court stated the following:
“[T]here is no question that the public has an interest in making sure that drivers of vehicles are properly licensed and that the vehicles they are driving are registered and equipped with safety devices. The Court of Criminal Appeals stated in Hagood [v. Town of Town Creek, 628 So.2d 1057, 1060 (Ala.Crim. App.1993) ]:
“ “The states’ interest in enforcing its registration and licensing laws and the difficulty in enforcing the laws by any other method” ... [has] been held sufficient to outweigh a minor intrusion upon persons stopped at roadblocks conducted for [that] purpose[ ].’ ”
Ex parte Jackson, 886 So.2d at 162. In the present case, although Officer Osborne stated that his task force was asked to go to an area because there had been violence in that area recently, Officer Osborne also testified that “[t]he roadblock itself was for the purpose of checking driver’s license, insurance, seat belts, make sure there were no drunk drivers, that kind of thing.” (R. 6.) Thus, because the United States Supreme Court in Brown and the Alabama Supreme Court in Ex parte Jackson have previously upheld driver’s license checkpoints as satisfying the first two prongs of the Brown test and advancing the public interest, we turn to whether the State satisfied the third factor — “the severity of the interference with individual liberty.”
*269 “To analyze the third factor — ‘the severity of the interference with individual liberty’ — we must determine whether the officers conducted the roadblock-type stop in a neutral and objective manner. As the Court of Criminal Appeals stated in Cains: ‘[Sjtops [of vehicles] at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist.’ [Cains v. State,] 555 So.2d [290] at 293 [ (Ala.Crim.App.1989) ]. We must determine if the stop in Jackson’s case was ‘minimally intrusive to the individual motorist.’ The Court of Criminal Appeals stated in Cains that ‘the manner of operation and the physical characteristics of a roadblock,’ 555 So.2d at 296, affect the intrusiveness of the stop. The Court of Criminal Appeals then quoted a 13-factor analysis adopted by the Kansas Supreme Court:
“‘“(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.” ’
“555 So.2d at 296 (quoting State v. Deskins, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983)). We agree with the Court of Criminal Appeals that we should not exalt form over substance and that some of the 13 factors outlined above are not pivotal to determining whether a particular roadblock-type stop is ‘minimally intrusive.’ However, those factors are helpful considerations to take into account when determining whether the officers conducted the stop pursuant to an ‘objective standard.’
“We also agree with the Court of Criminal Appeals that because a roadblock-type stop to examine driver’s licenses is warrantless and not based on an ‘articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered,’ [Delaware v.] Prouse, 440 U.S. [648] at 663, 99 S.Ct. 1391 [ (1979) ], the State has the burden of proving that it was reasonable under the Fourth Amendment. Hagood [v. Town of Town Creek], 628 So.2d [1057] at 1062 [(Ala.Crim.App.1993)].”
Ex parte Jackson, 886 So.2d at 161-63.
As previously stated, Woolen contends that the roadblock in the present case was unconstitutional because “it was not carried out pursuant to a plan embodying explicit mutual limitations on the conduct of the individual officers, as required by Ogburn v. State, 104 So.3d 267 (Ala.Crim. App.2012).” (Woolen’s brief, at 17.) In Ogbum, one of the troopers conducting a checkpoint stopped Ogburn and came to believe that he had been driving his vehicle under the influence of alcohol.
“Concerning the procedures that were used when a vehicle was stopped at the checkpoint, Trooper Salvador testified that, after a vehicle pulled up to the checkpoint, an officer would ask the driver to present his or her driver’s *270 license and proof of insurance. If the driver could produce a valid license and proof of insurance and if the officer did not suspect that the driver was - under the influence of alcohol, the vehicle was allowed to proceed through the checkpoint. Defense counsel asked Trooper Salvador: ‘If an automobile is approaching the roadblock and comes up to it and you notice that it’s one of our local circuit judges, did you have the authority and discretion to wave them on through and not ask for that?’ (R. 24.) Trooper Salvador responded: ‘I’d check everybody, sir.’ (R. 25.) Defense counsel then asked: ‘But did you have the discretion to wave them through?’ (Id.) Trooper Salvador responded: Tes, sir. I would assume so.’ (Id.)
[[Image here]]
“At trial, Corporal Jesse Thornton, a supervisor with the Alabama State Troopers, was asked: ‘Do the troopers have any established policies in regards to establishing the checkpoint?’ (R. 6.) Corporal Thornton answered: ‘We do.’ (Id.) However, Corporal Thornton did not give any further testimony concerning those policies. Corporal Thornton further testified that he was involved with the checkpoint at which Ogburn was stopped on July 2, 2011. Corporal Thornton’s main duty that day was field supervision. Corporal Thornton stated that over the 4th of July weekend, the troopers conducted several sobriety checkpoints in an effort to deter drunk driving. Corporal Thornton determined the location of the checkpoint at which Ogburn was stopped. Corporal Thornton stated that he chose the location of the checkpoint based on safety and on the fact that the location was in a heavily traveled area. Corporal Thornton testified that the purpose of the checkpoint was to deter crashes caused by impaired drivers and to check for driver’s license and/or insurance violations. Corporal Thornton stated that the location was visible to motorists; that vehicles that were stopped at the checkpoint were able to pull out of the stream of traffic without causing significant interruption to the flow of traffic; and that the troopers used typical emergency equipment to warn oncoming motorists of the checkpoint. Corporal Thornton stated that the troopers working at the checkpoint were wearing reflective vests and were using flashlights. Corporal Thornton testified that approaching motorists could see the troopers’ vehicles and that the blue lights of the vehicles were flashing. Corporal Thornton stated that the officers stopped every vehicle that came through the checkpoint.
“The State introduced a ‘vehicle checkpoint’ form that documented the July 2 checkpoint. The form stated that Corporal Thornton approved the checkpoint, and the form was signed by him. The form further stated that the approved location for the checkpoint was on Friendship Road at Cherokee Trail in Elmore County. The form stated that the checkpoint started at 9:00 p.m. and ended at 11:00 p.m. and that the weather conditions during the checkpoint were clear and warm. The form also listed the officers who were assigned to the checkpoint and the enforcement activity that occurred at the checkpoint. Lastly, the form stated that it was submitted by Trooper Salvador. Corporal Thornton testified that the form was created after the checkpoint had ended but that the time and location of the checkpoint and the officers assigned to the checkpoint were determined before the checkpoint started.”
104 So.3d at 268-69.
Applying the above-discussed principles regarding checkpoint stops, this Court held that “the State did not carry its burden of proving the reasonableness of the *271 checkpoint stop. Specifically, the State did not present evidence showing that the checkpoint was ‘carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.’” Ogbum, 104 So.3d at 274. Further, this Court stated:
“Although we hold today that a written plan is not required by the Fourth Amendment, we strongly suggest that having a previously established plan that is in writing before the execution of the checkpoint is the best practice. If no previously established written plan is submitted into evidence, a witness for the State must specifically articulate the full details of the previously established plan that limits the discretion of the individual officers at the checkpoint in accordance with Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).”
Ogburn, 104 So.3d at 275. Thus, as this Court stated in Connell v. State, 141 So.3d 1108 (Ala.Crim.App.2013):
“Ogburn stands for the proposition that the State, in sobriety-checkpoint challenges, has the burden of establishing the existence of a ‘plan embodying explicit, neutral limitations on the conduct of individual officers,’ 104 So.3d at 274, and that the State may do so by either submitting a previously established written plan into evidence or by eliciting oral testimony of a witness who can ‘articulate the full details of the previously established plan.’ 104 So.3d at 275.”
141 So.3d at 1116.
The State’s evidence and testimony concerning the proof of the existence of a preexisting plan limiting the officers’ discretion was weak in this case. However, we find that the totality of the testimony elicited from the State’s witness was sufficient to establish the existence of a “previously established objective and neutral plan designed by higher ranking personnel to limit the discretion of the officers in the field” and the details of that plan that limited the discretion of the officers at the checkpoint. Ogbum, 104 So.3d at 274-75. Specifically, in Ogbum, the officer did not provide any testimony as to the substance of the troopers’ policies on checkpoints and how those policies placed explicit, neutral limitations on the conduct of the officers in the field, and “there was no evidence indicating that the officers in the field were given any particular instructions before the checkpoint began concerning how they were to conduct the checkpoint or concerning the extent of their discretion.” 104 So.3d at 275. In the present case, unlike the officer in Ogbum, when asked whether there were any explicit neutral limitations on his conduct as an officer working the roadblock, Officer Osborne stated that he did not have any written guidelines on that day but that the officers have an oral briefing at which the supervisor informs the officers of the plan, including the hours of the roadblock and the time span that the officers would be conducting the plan. Additionally, unlike in Ogbum, in which the officer testified that “he assumed that he had the discretion to allow a circuit judge to pass through the checkpoint without being stopped,” 104 So.3d at 268, Officer Osborne testified in the present case that if the mayor or a presiding judge was driving through the roadblock, he would have stopped them and asked for his or her driver’s license and proof of insurance. Further, unlike in Ogbum, in which this Court found that “there was no evidence indicating the officers’ discretion at the checkpoint was supervised by any official that was not in the field,” 104 So.3d at 275, Officer Osborne testified that, in addition to the supervisor who was in the field and at the location of the roadblock, there was also a duty lieutenant at one of the precincts if there was a need to seek instruction from someone higher up in the chain of command.
*272 We also note that Officer Osborne stated that his unit was in a well-lit area, that the marked patrol cars had their emergency-lights engaged to ensure that individuals approaching the checkpoint knew that they were the police, and. that the officers had flashlights and were wearing reflective gear. Officer Osborne also stated that drivers were usually detained for about only one minute if they had a valid driver’s license and proof of insurance.
As this Court noted in Ogbum, “the primary wrong that the Fourth Amendment seeks to prevent is unbridled police discretion.” 104 So.3d at 275. The instant case embodies the primary concerns that are caused by the failure to have a previously established written plan, and it further strengthens the position that having an established written plan in place before a roadblock or a checkpoint is the best practice to ensure that officers do not exert the unbridled police discretion that the Fourth Amendment seeks to prevent. However, in the present case, although the evidence presented did not establish as clearly as would be preferred, there was sufficient evidence presented by the State’s witness to establish that there was a preexisting plan limiting the officer’s discretion at the checkpoint. Therefore, the circuit court properly determined that the checkpoint in the present case was carried out in a neutral and objective manner, and the circuit court did not err in denying Woolen’s motion to suppress.
Accordingly, based on the foregoing, the judgment of the circuit court is due to be affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. The Fourth Amendment to the United States Constitution states:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”
The United States Supreme Court has held that the protections of the Fourth Amendment extend to the states through the operation of the Due Process Clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).